# IN THE COURT OF APPEALS OF IOWA

No. 25-1073
Filed September 17, 2025

IN THE INTEREST OF C.C.,
Minor Child,

D.C.-M., Father,
    Appellant,

A.H., Mother,
    Appellant.

_____

Appeal from the Iowa District Court for Woodbury County, Mark C. Cord III, Judge.

A mother and father separately appeal the termination of their parental rights to their child. **AFFIRMED ON BOTH APPEALS.**

John S. Moeller of John S. Moeller, P.C., Sioux City, for appellant father.

Molly Vakulskas Joly of Vakulskas Law Firm, P.C., Sioux City, for appellant mother.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Timothy A. Scherle, Sioux City, attorney and guardian ad litem for minor child.

Considered without oral argument by Tabor, C.J., and Greer and Buller, JJ.

**GREER, Judge.**

A mother and father separately appeal the termination of their respective parental rights to C.C., born in July 2024.  The mother challenges the termination, arguing (1) the State did not prove statutory grounds for termination under Iowa Code section 232.116(1)(h)(4) (2025), (2) termination is not in the best interest of the child, and (3) the juvenile court should have granted a six-month extension to work toward reunification.  The father solely challenges the finding as to his rights under the same statutory ground for termination.

We affirm the decision of the juvenile court terminating the mother's and father's parental rights to C.C.

**I.      Background Facts and Proceedings.**

The family first came to the attention of the Iowa Department of Health and Human Services (HHS) a few days after C.C.'s birth when it was reported that C.C.'s urine tested positive for methamphetamine.  The mother's urine also tested positive for methamphetamine and amphetamine.  This resulted in a founded child abuse assessment for presence of illegal drugs in a child because the mother's substance use caused a positive test for C.C.  At first the mother denied using methamphetamine, but the father reported they usually used at the beginning of the month.  The father's hair sample, collected in late July, also tested positive for amphetamine and methamphetamine.  In September, C.C. was adjudicated a child in need of assistance (CINA).

HHS removed C.C. from parental custody soon after his birth; he was initially placed with a foster family placement until a relative placement was located.  In August, HHS placed C.C. with the mother's cousin.  C.C. remained

with this relative placement through the termination proceedings—for most of his first year of life. In his relative placement C.C. maintained contact with his extended family. The mother's cousin began taking steps to adopt the child. C.C. has never been returned to parental care, had a trial home visit, or been in the unsupervised care of his parents.

Prior to C.C.'s birth, the mother and father were unhoused and did not have a stable place to raise the child. Yet, the parents made progress quickly; the month after C.C.'s birth the parents began residing in a trailer home purchased by the paternal grandmother. The mother began attending substance-use treatment sessions in October, and it was reported she would finish treatment in May or June 2025. The father began substance-use treatment in October as well and by May 2025 it was recommended he continue outpatient sessions for a few more weeks. The mother and father tested negative for all substances in December 2024 and April 2025.

At a medication management appointment in November 2024, the mother claimed she had not taken her mental-health medication for three months. She had missed several appointments since August because she was overwhelmed or had technical difficulties accessing virtual appointments. In January 2025, she had missed three more appointments since her November visit and been out of her medication for a few weeks.

The mother had a psychological evaluation in February 2025 but cancelled her follow-up appointment for later that same month. The evaluation revealed "multiple factors that interfere with parenting, which include illicit substance use, intellectual/cognitive deficits, and emotional dysregulation." In the evaluation it

was noted these factors interact in a way that causes vulnerability with parenting and may degrade her parenting decision making. The evaluator recommended the mother continue mental-health therapy, medication, and consider additional services. But the mother continued to miss mental-health appointments after the evaluation. If reunification occurred, oversight by HHS for a temporary amount of time was recommended. In April, the mother reported she had been out of her mental-health medications for over two months and was able to get them refilled.

The father underwent a psychological evaluation in March and was noted to have below-average intelligence. He was diagnosed with a number of mental-health disorders yet declined any mental-health medication support.

Shortly after removal the parents began having two-hour visits twice a week with C.C. The father missed approximately one month's worth of visits due to being incarcerated in early 2025. Throughout HHS's involvement, the parents have lacked consistent attendance and sometimes had to end visits early, often citing transportation issues. Despite having transportation services available to them the parents did not use these services regularly. Nor have the parents been consistent in providing necessities for all visits with C.C. At some visits the parents have shown up with no supplies or an unwashed bottle.

Both parents successfully completed two parenting courses, the first course in April and the second in May, that taught skills about safety concerns and managing stress from a child. Even so, the most recent progress report cited continuing parenting concerns. The mother made formula in a sports drink bottle and offered it to the child, even after repeated prompts by the visitation specialist not to give C.C. the bottle. The visitation specialist also reported that the parents

let C.C. practice standing in a way that could lead to injury, and the mother suggested the child be placed on his back so he could "get a flat head." The father has reported frustration with C.C. because it can be unclear what the child wants. And the father testified it took both parents to change C.C.'s diaper during their visits with him because the child moved around and they were afraid to drop him.

In May, the parents reported to the social worker case manager that a paternal aunt had used marijuana in their home. The aunt began living with them at the request of the paternal grandmother. The father testified that the aunt invites her friends over and plays loud music. He has smelled "weed" coming from her room.[1] The father, mother, and aunt all pay rent to live in the home. As the juvenile court noted, because the aunt pays rent "[i]t could take time for her to be forced to leave if she chose not to leave."

In March, the State petitioned for termination of both the mother's and father's parental rights to C.C. The grounds for termination alleged the child could not be returned to the parents as neither parent had successfully addressed their mental-health concerns or internalized parenting skills. The termination hearing began in March and was finalized in May. At the hearing, a social worker case manager testified that neither parent was on the path to obtaining unsupervised visits with C.C. She testified that the main concern for both parents was their mental health and medication management. The father later testified he was not seeking mental-health treatment.

---

[1] The mother testified contrary to this and claimed the aunt does not use substances and she may have smelled "skunk" instead of marijuana.

At the termination trial both parents argued a guardianship should be put in place in lieu of termination. HHS argued C.C. was too young for a guardianship and termination of the parents' rights was in his best interest. The mother asked for more time to utilize more services to better be able to care for the child. The guardian ad litem (GAL) shared his concern about the parent's ability to take care of C.C. both at the time of the termination hearing and in the future "be it six months or longer." In May, the juvenile court terminated the mother's and father's parental rights to C.C. pursuant to Iowa Code section 232.116(1)(h). Both parents now appeal.

## II.     Standard of Review.

"We review termination proceedings de novo." *In re J.R.*, 20 N.W.3d 839, 843 (Iowa Ct. App. 2025). "We will uphold an order terminating parental rights where there is clear and convincing evidence of the statutory grounds for termination." *In re T.S.*, 868 N.W.2d 425, 434 (Iowa Ct. App. 2015). "Evidence is clear and convincing when there is no serious or substantial doubt as to the correctness of the conclusions of law drawn from the evidence." *Id.* at 435. "Our primary concern is the best interests of the child." *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006).

## III.    Analysis.

Both parents challenge the termination of their respective parental rights. We apply a three-step analysis when reviewing the juvenile court's decision to terminate parental rights, asking whether (1) a statutory ground for termination is satisfied, (2) the child's best interests are served by termination, and (3) a permissive exception applies and should be exercised to preclude termination.

*See In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022); *see also* Iowa Code § 232.116(1)–(3).

**A. Mother's Appeal[2]**

We address each parent's appeal separately. *See In re J.H.*, 952 N.W.2d 157, 171 (Iowa 2020) ("In termination of parental rights proceedings each parent's parental rights are separate adjudications, both factually and legally." (cleaned up)). We address the mother's appeal first.

1. *Statutory Ground for Termination*. First, the mother argues the State failed to prove Iowa Code section 232.116(1)(h) by clear and convincing evidence. The mother only challenges the fourth element, which allows the court to terminate parental rights when "[t]here is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time." Iowa Code § 232.116(1)(h)(4);[3] *see In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) (interpretating "at the present time" to mean at the time of the termination hearing). At the time of the termination hearing the mother was not

---

[2] The State argues the mother has waived error to all of her issues on appeal by failing to make a substantive argument. We assume without deciding that the mother adequately briefed the issues we address, and we proceed to the merits related to those issues.

[3] The other elements for termination under section 232.116(1)(h) are:

(1) The child is three years of age or younger.

(2) The child has been adjudicated [CINA] pursuant to section 232.96.

(3) The child has been removed from the physical custody of the child's parents for at least six of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.

At the time of the final day of the termination hearing in May 2025, C.C. was less than one year old, had been adjudicated CINA, and had been removed from the parent's custody for the previous ten consecutive months.

in a position where she could care for the child. *See In re J.R.*, No. 18-1247, 2019 WL 478690, at *2 (Iowa Ct. App. Feb. 6, 2019) (affirming termination when the mother could not perform basic parenting skills, like changing her child's diaper). Even with support available to her she concedes she could not have the child at home without monitoring from HHS or help from others. Service providers also could not recommend unsupervised care by the mother. Due to the "little progress on the various issues" that prompted initial involvement by HHS, the GAL recommended termination of both parents' parental rights. Commendably, the mother does seem to have improved in her sobriety. But she exhibited a lack of consistency with mental-health treatment and limited parenting improvements. Likewise, there is uncertainty with the paternal aunt still residing in their home and issues with her prior substance use.

We will not gamble with this young child[]'s future by asking him to continuously wait for a stable biological parent. *D.W.*, 791 N.W.2d at 707. As observed by the juvenile court, the mother did not develop a capacity to care for C.C. in a way to ensure his health and safety without ongoing support and oversight. We find clear and convincing evidence for termination under Iowa Code section 232.116(1)(h). *See In re M.S.*, 889 N.W.2d 675, 680 (Iowa Ct. App. 2016) ("A child cannot be returned to the custody of the child's parent under section 232.102 if by doing so the child would be exposed to any harm amounting to a new child in need of assistance adjudication." (cleaned up)); *see D.W.*, 791 N.W.2d at 708 (recognizing that "lower mental functioning alone is not sufficient grounds for termination," but can be a contributing factor to a parent's inability to provide a safe and stable home).

2. *Best Interest*.[4]  Next, the mother argues termination of her parental rights is not in the best interests of C.C.

In assessing best interests of a child we give primary weight "to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child."  Iowa Code § 232.116(2).  When deciding what is in a child's best interests we consider what care the child would receive if returned to the parents.  *J.H.*, 952 N.W.2d at 798.  To determine this "we look to the parents' past performance because it may indicate the quality of care the parent is capable of providing in the future."  *J.E.*, 723 N.W.2d at 798 (quoting *In re C.K.*, 558 N.W.2d 170, 172 (Iowa 1997)).  As noted by the juvenile court, relevant considerations in best interest analysis include the "mental capacity of a parent and the existence of a preadoptive foster family in the life of a child."  *D.W.*, 791 N.W.2d at 708.  C.C. has been in the care of his mother's cousin since he was less than two weeks old and has developed successfully.  She has provided for his needs, and she intends to adopt the child.  By the time of the termination hearing, the mother was unable to internalize safe parenting techniques and care for C.C alone.  We find termination of the mother's rights and adoption is in C.C.'s best interests

---

[4] In the "Issue #2" section of her petition on appeal, the mother mentions in passing that "a guardianship is in the best interests of the minor child to ensure the bond between CC and Mother remains intact."  But the mother fails to develop an argument beyond that, so we do not consider the guardianship issue.  *See* Iowa Rs. App. P. 6.201(1)(d) (requiring petitions on appeal to "substantially comply with rule 6.1401—Form 5"), 6.1401—Form 5 ("[S]tate what findings of fact or conclusions of law the district court made with which you disagree and why, generally referencing a particular part of the record, witnesses' testimony, or exhibits that support your position on appeal: . . . Include supporting legal authority for each issue raised, including authority contrary to appellant's case, if known.").

*3. Additional Time.*  Lastly, the mother claims the juvenile court should have granted additional time for her to engage with the services set forth in her psychological evaluation.  After the termination trial, the juvenile court may decide to not terminate parental rights if it finds there is clear and convincing evidence that CINA proceedings should continue and enter an order to extend the time for reunification in accordance with section 232.104(2)(b).  Iowa Code § 232.117(5).  The court may continue the proceedings for an additional six months if it finds "the need for removal . . . will no longer exist at the end of the additional six-month period."  *Id.* § 232.104(2)(b).  "It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child."  *In re A.M.*, 843 N.W.2d 100, 112 (Iowa 2014) (citation omitted).  The mother only made small improvements in managing her mental health and her parenting techniques with C.C.  A delay would not be in C.C.'s best interests; the social worker case manager testified that additional time could be harmful to C.C. "given his age, he needs structure and a permanent home."  We agree with the juvenile court that additional time is not warranted because we cannot say the need for removal would be resolved within six months.

## B.  Father's Appeal

The father only makes one argument on appeal: the State failed to prove a statutory ground for termination.

*Statutory Ground for Termination.*  The father asserts that the State failed to prove termination under Iowa Code section 232.116(1)(h) by clear and convincing evidence.  Pursuant to this paragraph a juvenile court may terminate

parental rights when the child cannot be returned to the care of the parent at the time of the termination hearing, among other elements not in dispute here. *See* Iowa Code § 232.116(1)(h)(4). The evidence established that at the time of the termination hearing the father was unable to care for C.C. *See, e.g., In re R.B.,* No. 02-1824, 2003 WL 290028, at *1 (Iowa Ct. App. Feb. 12, 2003) (affirming termination of a father's parental rights for several reasons including when he could not demonstrate basic parenting skills necessary to care for his children and failed to address his mental health with medication); *J.R.,* 2019 WL 478690, at *2 (affirming termination when the mother struggled with basic skills, like changing a diaper). Since C.C.'s birth, the child has never lived with the father. The social worker case manager testified that the unaddressed concerns at the time of the termination trial were the father's mental health, substance use, and medication management.

But there were also concerns related to the father's ability to handle basic care of C.C. The father mentioned stress from parenting C.C. during their visits—only total four hours per week—and as the juvenile court and GAL pointed out there are another 164 hours within the week to consider. Both parents struggled with knowing what C.C.'s needs were, like if he was hungry. Even with the assistance of parenting classes the father could not change C.C.'s diaper by himself or consistently bring necessary items to care for C.C. during their visits. Despite access to services, the father did not want to attend mental-health therapy or take medications. At the termination hearing the social worker case manager testified the father could not have C.C. in his custody. Admirably, the father seemed to progress in his sobriety, but this alone was not enough to ensure safe

caretaking for C.C. *See D.W.*, 791 N.W.2d at 707–08 (affirming termination despite the mother's current commitment to sobriety because she could not overcome her parenting deficiencies). Additionally, there was uncertainty as to whether the paternal aunt will still reside in the home and concerns with her prior substance use.

We affirm the termination of the father's parental rights because the State proved that the child could not be safely returned to the father's custody at the time of the termination hearing.

## IV. Conclusion.

For these reasons, we affirm the juvenile court's termination of both the mother's and father's parental rights.

**AFFIRMED ON BOTH APPEALS.**